# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

UNITED STATES OF AMERICA ex rel.
HENRY GRIFFIN,

      Petitioner,

        v.

JOSEPH MATHY, Assistant Warden,
Pontiac Correctional Center,

      Respondent.

No. 98 C 5024
Judge James B. Zagel

## MEMORANDUM OPINION AND ORDER

This federal court proceeding began with Petitioner, under sentence of death, seeking the writ of habeas corpus.  He filed in August 1998.

After the petition was filed it did not follow the ordinary course.  During the earliest stages, Petitioner's counsel, Richard Cunningham, was slain by his own mentally troubled son in March 2001.  He was an able and distinguished lawyer who served many inmates under sentence of death.  His demise significantly slowed the progress of the case.

This was so because resolution of some of the claims, it appeared to me, could not be resolved without an evidentiary hearing.[1]  While Petitioner did not make a claim of actual innocence, the allegations of his petition suggested that questions of innocence might be raised.  To that end, I contacted Professor Lawrence Marshall of Northwestern University Law School to suggest that justice might be best served if the law school clinics could provide legal assistance

---

[1] The state post-conviction practice rarely requires evidentiary hearings because the post-conviction petition is ordinarily heard by the trial judge who has seen and heard the evidence and the performance of counsel and others at trial.

to Petitioner.  Eventually Professor Thomas Geraghty appeared for and represented Petitioner at various stages of the proceedings.

After counsel for both parties examined the voluminous records in this case and discovery disputes were resolved, the challenges to the verdict and sentence requiring a hearing were boiled down to two.  An evidentiary hearing was held with respect to the claims that the prosecution had knowingly used the false testimony of a key witness and that defense counsel was constitutionally ineffective at the sentencing phase of the trial.

While the lawyers were doing their work, the Governor of Illinois commuted every death sentence imposed in Illinois courts.  The effect of this was a delay in most, if not all, post-conviction capital cases.

There were three major questions that had to be answered before a petitioner like Griffin would know how to proceed.  First, was whether the commutation was within the Governor's power to grant to an inmate who had not requested a pardon.[2]  The Supreme Court of Illinois held that such commutations were within the Governor's power.  *People ex rel. Madigan v. Snyder,* 804 N.E.2d 546 (2004).  Second, was whether a defendant whose conviction is reversed or vacated and remanded may be sentenced to death after a new trial.  It was important for Petitioner to know the answer to this before deciding to press on with claims that might result in a new trial.  The Supreme Court of Illinois held that there could be no death penalty after retrial.  *People v. Morris,* 848 N.E.2d 1000 (2006).  Third, does the commutation of the death sentence render moot a claim of ineffectiveness of counsel at sentencing, which was my initial view.  The

_____

[2] I assume Griffin falls within this class because pardon or commutation is rarely requested before other legal remedies are exhausted.

Court of Appeals held that the commutation does not moot that claim. *Simpson v. Battaglia,* 458

F.3d 585 (7th Cir. 2006). By mid-2006, the petitioner could safely decide to pursue the writ. In

2008, Petitioner formally moved for reconsideration of my decision that the counsel at sentencing

claim was moot and I granted it.

Briefing was done in stages throughout this process and an evidentiary hearing was held

as well. The matter became fully briefed in March of this year.

The basic facts of the case are set forth in the opinion of the Supreme Court of Illinois:

The body of Carl Gibson was discovered near the 73rd Street exit ramp off of the Chicago Skyway on the morning of June 21, 1984. He had been shot four times at close range several hours earlier. A homicide investigation ensued.

At the time of the Gibson murder, the Chicago police department and the State's Attorney's office of Cook County were involved in "Operation Camelot" - an investigation of a major drug operation located on Chicago's south side. The investigation targeted the narcotics network of Charles Ashley, a drug dealer whose activities yielded an estimated $3 million annually. The victim was employed in Ashley's drug operation.

Also employed by Ashley's drug operation was Darryl Moore, who was arrested in August 1984 on drug and unlawful use of weapons charges. While in jail, Moore contacted Michael Pochordo, a detective with the Violent Crimes Division of the Chicago police department. Moore informed Pochordo that he had information concerning the Gibson murder and Pochordo set up a meeting with Moore and representatives of the State's Attorney's office. At a meeting on August 7, 1984, Moore supplied the State's Attorney's office with information concerning defendant's involvement in the murder. The information was sufficient for them to request permission for a consensual overhear device for use in Moore's contact with defendant. Application for the overhear device was approved by the circuit court of Cook County on August 8, 1984. On August 9, 1984, a tape-recording device was assembled at the State's Attorney's office, and Moore was instructed to call defendant. Moore recognized defendant's voice because he had known him through their "enforcer" work, and had spoken to him at least 100 times. During his taped

conversation with Moore, defendant implicated himself in the murder of Carl Gibson.[3]

Defendant was subsequently arrested and transported to the Violent Crimes Division in Area I. James Allen was also arrested in connection with the incident, and the men were placed in separate interview rooms. Assistant State's Attorney Neil Cohen was introduced to defendant and read defendant his *Miranda* warnings. Defendant inquired as to whether Cohen had talked to Allen and, upon hearing that Allen had made a statement, waived his *Miranda* rights and confessed to his participation in Gibson's murder. Defendant's confession revealed the following facts.

Ashley approached defendant and asked him if he would kill Gibson for $2,500. Ashley said that he wanted Gibson eliminated because he suspected that Gibson was secretly passing information to police. The offer was made and accepted in the presence of James Allen. Defendant and Allen then proceeded to the apartment of Darryl Moore, to obtain a gun. Moore was a fellow "enforcer" for Ashley and he and defendant had worked together in the past. Moore gave defendant a .38 caliber revolver and defendant and Allen left the apartment and dropped off members of defendant's family at home.

Defendant returned from the family home to the car accompanied by Carl Gibson. Allen drove the car, Gibson sat in the passenger seat and defendant sat in the back seat. Allen drove onto the Chicago Skyway at 89th Street, proceeding southbound. When he reached a toll plaza, he turned the car around and proceeded northbound. While driving northbound on the Skyway, defendant shot Gibson four times in the back of the head with a .38 caliber revolver. Allen then exited the Skyway at 73rd Street and stopped the car on the exit ramp. Defendant then pulled the body out of the car. The next day, defendant gave the murder weapon to Ashley. The rental car used in the slaying was disposed of by defendant and Allen. Defendant was paid by Ashley in cash and cocaine.

Subsequent to his confession, defendant was indicted with his codefendants Charles Ashley and James Allen, for conspiracy to commit murder, solicitation to commit murder and murder. Prior to trial, the court found defendant fit to stand trial and denied defendant's motion to suppress evidence seized pursuant to a search warrant. The case was tried before a jury in June 1985. Moore testified as part of the State's evidence against defendant. Additionally, Assistant State's Attorney Cohen testified regarding the defendant's oral and written confessions. The taped telephone conversation between Moore and the defendant was also admitted into evidence. Following presentation of the State's evidence, the defense

---

[3] The tape still exists but it is unintelligible. I accept, as I am bound to do, the state court's characterization of what was on the tape.

called its only witness, Detective Pochordo. Pochordo testified that he was initially contacted by Moore and that Moore had been an informant in 10 previous homicide cases, six of which had resulted in murder convictions to date. The jury found defendant guilty on all counts.

On November 17, 1989, defendant filed a post-conviction petition alleging that "substantial perjury" was employed to convict defendant and that the State's Attorney's office knew or should have known of the perjured evidence. Specifically, the petition alleged that Darryl Moore was paid $25,000 by the State's Attorney's office to lie at defendant's trial, and that Detective Pochordo's affidavit which supported the taped conversation was also a lie. Attached to the petition was a transcript of a video recording wherein Moore recanted his trial testimony and an excerpt of Moore's testimony at an unrelated trial. The petition requested an evidentiary hearing.

The video recording was taken on August 20, 1986, by defense attorney, Sam Adam. On the recording, Moore stated that his testimony at the defendant's trial was a lie. He further stated that his testimony was based on information he had received from Detective Pochordo and members of the State's Attorney's office. In particular, Moore had received a copy of James Allen's 16-page statement made subsequent to his arrest for the murder. In return for his testimony, Moore stated that he was housed in a Holidome hotel with his fiancee, that his living expenses were paid for, and that he was provided with money to purchase a catering truck from which he could sell hot food. Moore testified that the money for his "lavish lifestyle" came from the State's Attorney's office.

On August 10, 1987, Moore was a key witness in another Cook County homicide case, *People v. Freeman,* No. 86-CR-2090. During his testimony, Moore stated that he had lied at defendant's trial, and had been paid to do so by Detective Pochordo and members of the State's Attorney's office.

*People v. Griffin,* 592 N.E. 2d 930, 931-932 (1992) (direct appeal and appeal of denial of the first post-conviction petition).

I begin with the two issues that were the subject of the evidentiary hearing.

1. Ineffective Assistance of Counsel

    A. Decisions Within the Reasonable Range of Competence

Petitioner was represented at trial and sentencing by George Howard, a well-known defender in criminal cases.[4]  Howard anticipated that both guilt and sentence would be tried before the jury, but he had not prepared for the penalty phase.  He thought that, by Petitioner's waiving the jury, he would be given some time to prepare.  This was one of the reasons he recommended to Petitioner that he should waive the jury at the penalty phase.  His other reason, which, unlike Petitioner's counsel, I find particularly credible, is that he believed that Judge Earl Strayhorn, a truly distinguished judge, would not readily impose the death penalty.[5]

During the death penalty eligibility phase, defense counsel did not challenge the evidence. After Judge Strayhorn found Petitioner eligible for the death penalty, he inquired whether defense counsel was ready to proceed on aggravation and mitigation.  Mr. Howard said, "Not really, Judge because knowing very well that based upon the conviction and . . . the age of the defendant, that there wouldn't be any problem with satisfying the law relative to his eligibility, I would think, your Honor, that . . . as a result . . . of the jury's verdict and so forth that I . . . think we would like to do, at this point, is to set the matter down for some post-trial motions and hear those matters before we move into any other further evidence concerning aggravation of any kind."

---

[4] Based on reported cases, disciplinary records and reputation within the community of lawyers who practice in criminal cases, it is fair to say that Mr. Howard was well-known as a lawyer whose performances were erratic.  He is thought to have done some good work and some poor work.  He has been reprimanded and suspended from the practice of law in some courts, including the Court of Appeals.  He is, according to the undisputed statement of petitioner's counsel, currently without license to practice in Illinois.

[5] Judge Strayhorn said that "a judge is not society's avenging angel."  This quote appeared in his obituary in the Chicago Tribune.  In the record in this case Judge Strayhorn suggested that there were very few cases that would call for the death penalty. George Howard testified that "Judge Strayhorn had–you know, you learn your judges. . . . He had a reputation of being a Judge that would not impose the death penalty.  I didn't believe he would do it."

Judge Strayhorn responded, "No, that's not my understanding of what the statute requires Mr. Howard."  Defense counsel said, "All right."  The court denied the "motion for continuance for filing of post-trial motions."

The case in aggravation was quite simple–all the evidence at trial was re-offered along with certified copies of his six prior convictions.[6]  The case in mitigation was, first, the testimony of Petitioner.  Second was the testimony of someone who knew Petitioner, a woman who was according to defense counsel, "by chance . . . in the court room . . . in desperation I called her."

Petitioner testified that he had long been addicted to heroin and cocaine which he had unsuccessfully attempted to escape while working for an organization that aided ex-convicts.  On cross-examination Petitioner admitted selling marijuana while working in order to make ends meet.  Petitioner also testified, without much detail, that he had been committed to a mental institution as a teenager because he attempted suicide and suffered from depression.  Petitioner had also escaped from the institution on two occasions.  On cross-examination Petitioner denied that he had ever killed anyone despite the fact that the jury had convicted him.[7]

---

[6] Attempted Robbery (1965), Robbery (1972), Mail Theft (1972), Bank Theft (1972), Unlawful Use of a Weapon (1978), Possession of a Controlled Substance (twice in 1982).

[7] Some of the argument (and the tone) of Petitioner's brief on Mr. Howard's performance does not well serve the petitioner.  Defense counsel is faulted because he "managed to highlight the focus of the State's case . . . that Mr. Griffin was convicted of other crimes."  But the prosecutors, in any case like this, would have ample opportunity to highlight prior offenses with or without a defendant's testimony that the offenses were committed while under the influence of drugs.  Nor did the prosecution need Petitioner's testimony to show he escaped twice from mental institutions.  The decision to put Petitioner on the stand is criticized because it gave "the State . . . another opportunity to imply that Mr. Griffin was [a drug dealer's] enforcer responsible fo the death [of] countless . . . individuals."  This too is a trivial point because the prosecutors did not need another chance to "imply," the rules of criminal procedure give them more than enough chances to attack the defendant.  The decision to put Petitioner on the stand may have been wrong but not for these reasons.  And these are not the only makeweight arguments.

The second witness, Ida Powe, testified that Petitioner did not have a reputation for violence and was not capable of doing what he was convicted of doing. Defense counsel had not spoken to her until minutes before she testified. He used this fact in closing argument to show she was not a coached or manipulated witness.

Defense counsel's argument did touch upon Petitioner's difficult life, but its main thrust was to raise a residual doubt argument as a reason for not imposing the death penalty. It also urged that Petitioner would be better able to assist his appellate lawyers with the case's unsolved mysteries if he is not "operating on the cloud of death."

The essential criticism of defense counsel is that he offered no records documenting Petitioner's troubled past, no expert testimony, and no theme in his closing argument. The choice made by defense counsel allowed the prosecutors to cite the statutory mitigating factors and point out that none were proven.

---

It is unwise for counsel who attacks the competency of prior counsel to use makeweight reasons in support of a claim of ineffective assistance of counsel. This is particularly so in a case where there are far better arguments also made for that claim. A judge may infer either that petitioner's counsel thinks that the better arguments are not good enough or that petitioner's counsel does not have enough trial experience to weigh properly the state of the record.

These missteps are of no consequence here. I do not judge a case on the basis of what I think is going on in the mind of an advocate (or, as happened at trial here, Mr. Howard's opinion of his own client chewing gum on the witness stand), but rather on the merits of the appropriate arguments they do make. It is for juries that rhetorical flourishes (even if weightless) are made and repetition is required. Had there been a jury at the sentencing phase, these additional "opportunities" to make a point might, in some cases, have some tactical significance.

Judge Strayhorn sat alone on sentencing. He was an experienced trial judge, and there is no showing that he would be unduly influenced by the fact that Petitioner had both a criminal history and a mental health history (though he might be surprised if neither existed). Nor would he be influenced by another opportunity for the prosecutors to say the word "enforcer." He would not have forgotten the point made at trial and would not give prosecutors or their case credit for saying it one or two more times. This fact is acknowledged by Petitioner's counsel when they argue, on another issue, that defense counsel should not have made an argument because it "rehashed [an argument] for the Court, who had also heard it before."

After this, there was a delay while a presentence report was prepared. It contained some errors which were not challenged or corrected by defense counsel. Nor did defense counsel conduct further investigation of Petitioner's statements in the probation officer's report that Petitioner was having problems with his physical and mental health. Defense counsel declined to offer further evidence in mitigation when offered the chance to do so by the Court. Judge Strayhorn imposed the death sentence.

The state courts found that the decision to forego mitigation was "strategic," that is, a decision reasonably made by defense counsel under the circumstances in which he found himself. Such strategic decisions cannot be the basis for a claim of ineffective assistance of counsel even if they turn out to be quite wrong.[8]

The writ can issue only when the state court decision (1) is contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or (2) is based on an unreasonable determination of the facts in light of the evidence presented in the state courts. 28 U.S.C. §2254(d).

Unreasonable applications are those which are not only incorrect or erroneous but objectively unreasonable in light of holdings (not dicta) of the Supreme Court. *Rompilla v. Beard,* 545 U.S. 374 (2005).

---

[8] Under current circuit precedent, I owe deference to the state courts' determination of the facts even when I hold an evidentiary hearing to determine facts. *See Pecoraro v. Walls,* 286 F.3d 439, 443 (7th Cir. 2002). Other circuits disagree, *see Brown v. Smith,* 551 F.3d 424 (6th Cir. 2008), although mostly in cases involving violations of *Brady v. Maryland*, which is at issue in this case. *Monroe v. Angelone,* 323 F.3d 286 (4th Cir. 2003). The Supreme Court has not resolved the issue.

Unreasonable determinations of facts in light of the evidence presented have to be proven by Petitioner by clear and convincing evidence. *Miller-El v. Dretke,* 545 U.S. 231 (2005).

The clearly established federal law on ineffective assistance of counsel is found in *Strickland v. Washington,* 466 U.S. 668 (1984). Petitioner must show that counsel's representation fell below an objective standard of reasonableness at sentencing. *Wiggins v. Smith,* 539 U.S. 510 (2003). If Petitioner succeeds, he must also show prejudice as a result of counsel's failings.

In this case, defense counsel made no investigation for mitigating evidence. He said so in an affidavit and in testimony before me. He did not attempt to obtain school, mental health, or prison records. He did not attempt to find mitigating witnesses, for which failure he claims no strategic reason. He did not talk to Petitioner, except in a general way, about his background. Counsel's decision was to rely on residual doubt.

Despite the general consensus that lawyers should conduct some mitigation investigation, it is not an absolute requirement to do so under Supreme Court precedent. Where there is information known to defense counsel that would require an investigation, failure to do so may be unreasonable under *Wiggins.* 539 U.S. at 526.

In this case defense counsel was informed that Petitioner had been sent to a state mental hospital in his early teenage years. Defense counsel asked for a Behavior Clinic Examination which, in Cook County, is a mental status examination which may be directed to the question of competency to stand trial and, in some cases, to the question of mental state at the time of the offense.

Defense counsel testified in this court that, had he been aware of Petitioner's mental health history, he would have presented it in mitigation.[9]

What then are the legitimate reasons defense counsel offers for his course of conduct?  He did not believe that the case warranted the death penalty – this was a case of one drug dealer killing another – and he did not believe Judge Strayhorn would impose the death penalty.  I do accept that Mr. Howard believed both things to be true.  He had other reasons, but I do not consider them; they all hinge on his expectations about other phases of the proceedings.  I do not, in the circumstances here, find that his confidence of winning on a suppression issue on appeal can justify a decision not to prepare for the sentencing phase.  Mr. Howard was also within a range of competence in his decision to argue residual doubt because there was no physical evidence.  However, the argument is weaker if it relies on the impeachment of Moore, because Moore's testimony was corroborated in important respects by what Petitioner said to Moore over the telephone.

While some of defense counsel's decisions are well within the range of competence, e.g., advice to waive the jury on sentencing given the views of the judge and the nature of the case, other of his decisions were not.  Petitioner's argument fails to the extent that it is based on the

---

[9] It is unclear to me whether, at the hearing, Mr. Howard knew the details of that prior mental history; from the hearing as a whole, I infer that he was not fully aware of the details. Petitioner's counsel uses Mr. Howard's answer to show that Mr. Howard would have used the prior mental history if he had been diligent.  I think the better argument for Petitioner here is that Mr. Howard's tactical judgment is not worthy of much respect if he says he would have used prior mental health history without a careful examination of its content and implications.  Prior mental health history often serves to aggravate, not mitigate, sentences by showing a defendant to be incurably dangerous.  Sociopathy is a recognized mental disease, but few competent defense counsel would ever choose to offer it in mitigation.  I do not know if this argument could be made because it is not clear precisely what Mr. Howard knew when he said he would have used the material.

premise that his lawyer's decision to proceed as he did cannot be called "strategic" (and thus permissible) if his lawyer had not conducted a full investigation of the alternatives. I do not find such a *per se* rule enshrined in the holdings of the Supreme Court of the United States.

Counsel's failing here is that he had no good reason not to examine, with care and due skepticism of the client's statements, the nature of his life to search for mitigation. Nor is there a good reason to fail to place any significant emphasis on showing good character in some aspects of his life.

This is so, not because exhaustive social history must be prepared in every case, but rather because in this case chances of acquittal were not high. There was a confession to a prosecutor and a taped non-custodial admission of guilt made to an informant. None of this evidence would be contradicted by Petitioner or any other witness. There was a very good reason, a patent reason, to mine the client's history because that is where some headway might be made. At the end of such an investigation, a decision to go with residual doubt might have been reasonable, but defense counsel could not weigh the question of a troubled youth (though he knew there was evidence of it) because he never investigated it.

Competent counsel would have directed significant effort toward investigating a case in mitigation because chances of winning acquittal were slight. Even Mr. Howard does not directly dispute this; his explanation is that he believed he would be given more time – a belief he held without receiving any signal from Judge Strayhorn that more time would be allowed. "I did not do my work on time just because I thought I would get more time" is not a suitable explanation to be offered by competent counsel in a capital case.

Mr. Howard said he believed the case against Griffin was weak due to the absence of physical evidence, the impeachability of Moore, and because the judge would set aside the

verdict. I do not credit this testimony. Mr. Howard did not believe this. The chosen plan of defense does not line up with such a belief. Defense counsel's decisions were based on the context of the case which included not only Petitioner but also Allen, the driver of the car used in the killing of the victim, and Ashley, the man who ordered the killing. The true target of the prosecution was the boss, Ashley, but he was dying. Petitioner's lawyer thought that if the boss died it would change the complexion of the case, so delay was the order of the day. This confirms, in my view, that defense counsel understood the chance of outright acquittal was very low.[10] The strategic decision failed because Judge Strayhorn insisted on trial.

There was a coordinated defense with all three of the accused refusing to concede any involvement with the murder.

I find that, with respect to the sentencing phase, Mr. Howard did not meet the objective standards of reasonableness in performing his duties to Petitioner. But since his error was failing to investigate social history when he had cause to do so and to consider its usefulness as an alternative or a supplement to residual doubt, the question of whether this prejudiced his client must be addressed under the dictates of *Strickland* and common sense.

### B. Prejudice to Petitioner Resulting From Counsel's Deficiency

In cases like these, petitioners customarily gather the evidence that defense counsel should have gathered and then try to show that its absence prejudiced the petitioner.

---

[10] The chosen strategy of counting on the death of Ashley would be based on the rational expectation that with Ashley dead, the greater part of the moral blame could be placed, without contradiction, on Ashley. This would be of value in avoiding the death sentence. And if the prosecutors were persuaded of Ashley's dominance of Petitioner, it could lead to a plea bargain. Ashley did not die soon enough for Petitioner. He was convicted but did not live long enough to appeal.

This is, sometimes, difficult to do. The wisdom of hindsight must be discounted. *United States ex rel. Kokoraleis v. Gilmore,* 131 F.3d 692, 696 (7th Cir. 1997). And what some think is mitigation, particularly evidence of a troubled youth, may be treated by judges and juries as aggravation. The missing evidence must lead to a conclusion that "there is a reasonable *probability* that . . . the result of the proceeding would have been different" and "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694 (emphasis added).

The proffered evidence is this:

Petitioner was one of six (or seven) children in a household and was the second youngest. His father had a decent factory job as a molder. By age 8, he was identified, correctly, as a slow learner and had symptoms of attention deficit disorder. At 12, his father had been laid off, after 27 years, when his plant was closed. The family moved into worse neighborhoods. His father began drinking full time and verbally abusing his children. According to 1962 social history notes, his mother sometimes left the home because of her husband's drinking. Petitioner once rode around in buses and trains, getting off at random stops to look for his mother. At 13, Petitioner started drinking and doing drugs. At 14, and only in the sixth grade, he dropped out of school. Enforcement of truancy laws sent him to a special school, but he ran away repeatedly and would end up in the Audy juvenile detention facility. While there he attempted suicide by jumping through a glass window. There is evidence of self-mutilation attempts, including blinding and further suicide attempts.

While at the Audy Home, his mother had a stroke and, after a short period, died. Confined at the Audy Home, Petitioner was unable to visit her. The mother had been the lynchpin of the family. When Petitioner returned home, he became the principal target of his father's verbal

abuse.

Petitioner was committed to Kankakee State Hospital where he attempted to escape. He was diagnosed in several different ways: "Schizophrenic Reaction, Chronic Undifferentiated Type - with Suicidal Tendencies," "Borderline and Schizotypal Personality." His younger sister, too, was committed to mental hospitals. There are medical opinions that his use of drugs beginning around age 17 was caused by his desire to lessen the effects of his mental illness.

There is evidence to show that, toward his family, Petitioner did display loyalty, willingness to help, and provided significant aid to his family. This evidence is, of course, less helpful than the mental condition evidence, partly because it comes only from family and partly because such evidence is usually neutralized by the traditional prosecution argument that, crudely rephrased, amounts to "sure he is fine with his sisters and brothers but if you are not related to him, watch out for your life."

By and large though, this is mitigating evidence that cannot be turned by the prosecution into aggravating circumstances.[11] The evidence was not presented to the sentencing judge either

---

[11] The only materials that might be of use to a prosecutor, at least in the material presented to me, is the line in one physician's report that remarked on Petitioner's "limited capacity for self observation and self correction," which could be said to be a sign of his potential to be a danger to himself and/or his community. Evidence of kindness to family members is not always helpful either since prosecutors routinely argue, with success, in all sorts of sentencing hearings from embezzlement cases to murder, that no one is safe from this defendant except his blood relations. The current wisdom regarding mental problems or a difficult life as mitigation is that such evidence works only when it supports one of two propositions. One is that the mental problem played a significant part in the genesis of the crime, e.g., a retarded boy shoots the store owner he robs because he has learned from non-stop watching of television shows that the killing is what is supposed to happen when one robs a store. The other is that his lot as a youth was one of terrible suffering and the addition of a death sentence to his suffering is morally unfair. I infer that the latter theory is the one Petitioner thinks should have been used.

directly or through the presentence report.[12]

I discount the implicit attack on the author of the presentence report who relied upon what Petitioner said to him. It is true that there is some evidence that Petitioner was able to aid in his own defense, but "barely" so. But there is also evidence from the professionals at the Behavior Clinic that Petitioner was "well able" to assist in his defense. Petitioner did testify in mitigation in a manner that apparently raised red flags with Judge Strayhorn. There is no testimony from Petitioner or anyone else that he could not give a reliable account of at least some of the events of his childhood.

It is not shown that Petitioner was unable to speak the truth about himself. There is no denial that he reported a "normal childhood and good relationships with his parents and siblings" and said nothing about the bad things in his life. Nor is there evidence that defense counsel told him to lie to the probation officer.

The Supreme Court of Illinois considered prejudice as it was bound to do. On direct appeal the Court unanimously affirmed with respect to the conduct of counsel at sentencing. The opinion for the Court was exceptionally brief for a capital case, i.e., "None of [the] contentions have merit." Two Justices specially concurred and offered far different reasons than the majority did for this conclusion:

Chief Justice Miller, specially concurring [joined by Freeman, J.]:

---

[12] I do count the argument that defense counsel should have provided additional information to the probation officer.

I discount the arguments about the claimed perjury of Darryl Moore with respect to ineffective assistance of counsel since Petitioner does not allege, and does not want to allege, that defense counsel was aware of the issues now raised with respect to that testimony. Whatever damage to Petitioner that can be laid at Moore's door is the fault of defense counsel. If Moore did perjure himself, then both verdict and sentence may be irretrievably flawed, but this is not the result of ineffective assistance of counsel.

> The defendant complains that counsel's argument ignored the
> available evidence of his psychological history and focused instead
> on the reliability of the testimony of his involvement in the charged
> offense. The defendant had a lengthy criminal history, however,
> and he committed the murder charged here only two months after
> his parole from prison. . . . [t]he defendant has failed to show that a
> different closing argument would have produced a different result.

592 N.E.2d at 938.

The concurring justices also noted, in connection with the relevance of the childhood

records to competency determinations, that the evidence was remote in time.[13]

These views were effectively adopted by a unanimous court in its opinion on appeal from

the denial of the second post-conviction petition. This is unsurprising since Chief Justice

Freeman, who authored the second opinion, was one of the two who specially concurred in the

first affirmance. *See People v. Griffin,* 687 N.E.2d at 820, 833-34 (Ill., 1997).

It was in this appeal from the denial of the second post-conviction petition that the state

court specifically addressed the claim of ineffective assistance presented here:

> We conclude that there is no reasonable probability that, absent trial counsel's
> alleged deficiencies, the sentencer would have found that the mitigating
> circumstances preclude the imposition of the death penalty. Defendant confessed
> that he executed the victim for money and narcotics. . . .[Defendant had] a lengthy
> criminal history. . . . Lastly, the post-conviction court in this appeal was the
> sentencer at defendant's trial. Attached to defendant's second post-conviction
> petition were supporting affidavits that described the proffered additional evidence.
> In dismissing the petition, the court stated that the introduction of this proffered
> evidence would not have changed defendant's sentence.

*People v. Griffin*, 687 N.E.2d at 834.

---

[13] I observe that not only is the data from his childhood remote (he was committed in
1962), but Petitioner did not seek to use here, or in the state post-conviction proceedings, social
history records that were far less remote. Petitioner was in prison for quite a while and on parole
for a few weeks before the offense. Petitioner does not offer (or, at least, does not argue) that the
prison records contain any mitigating information or helpful psychological data.

This was a state court finding of fact that the sentence would not have been different if the mitigation evidence proffered here by Petitioner had been offered and argued. This is not an unreasonable determination of fact under the habeas statute. Of course, the Supreme Court of Illinois could have rejected Judge Strayhorn's findings as to the state of his own mind (on grounds perhaps of unreliability, rather than deliberate misstatement), but they did not. There is nothing unusual either about reliance on the views of a judge as to whether some previously unknown circumstances would affect the sentence. Many opinions in federal post-conviction cases are resolved, in part or whole, by judicial statements that a new circumstance would not change a sentence. Remands by Courts of Appeals in federal cases to seek the view of a sentencing judge in light of changed circumstances are common and usually controlling.

Given the deference owed to the state court findings of fact, I reject Petitioner's claim to the writ based upon ineffective assistance of counsel at sentencing.[14]

2. The Testimony of Moore

Seven months after testifying in Griffin's trial, Moore testified before a grand jury that seven persons, including Petitioner, were responsible for the murder of Robert Ciralsky. Later, while Griffin's appeal in the present case was pending, Moore made a videotaped recantation of his testimony at Griffin's trial and his testimony before the Ciralsky grand jury. He testified at the trial of Franklin Freeman for the Ciralsky killing that he had lied at Griffin's trial because he had been paid to do so by Detective Pochordo and members of the State's Attorney's Office.

---

[14] I would reach the same conclusion in this case even if no deference was owed.

Unsurprisingly, Petitioner filed a post-conviction petition alleging knowing use of perjury in this trial. Judge Strayhorn denied the petition, and the appeal of that ruling was consolidated with the direct appeal. The Supreme Court of Illinois affirmed in both appeals.

There is no dispute that Moore received money from the prosecutor's office. From August, 1984 to June 20, 1986, the State's Attorney's office spent over $66,000 in relocation expenses for Moore and his dependents. According to financial records, the majority of the money was paid to Moore after he testified against Petitioner (about $7,000 before testimony and the rest afterwards).

Moore took the witness stand at the federal hearing I conducted. He testified that he was a major narcotics dealer who picks and chooses when he is going to tell the truth and when he is going to lie. Petitioner was, he said, an innocent man whom he was trying to help – all he testified to at Petitioner's trial was a lie and all material statements were recanted. He claimed that "Griff," the person he spoke with during the overhear, was not Petitioner.[15] The witness relocation rationale for paying him money was a disguise – the money was paid for his testimony.

The assistant state's attorneys who prosecuted the case denied the money was paid for testimony and testified they believed Moore was in serious danger and the money was intended for his relocation. Detective Pochordo was asked for $200 by Moore and provided it in a check – no other money was requested or given by the police. The detective was unaware of any financial

---

[15] To my knowledge, Petitioner had not denied that it was his voice, and Moore's testimony that it was not Henry Griffin that was speaking on the tape came as a visible shock to Petitioner's able counsel. As one of Petitioner's briefs notes, "Henry Griffin has conceded he was the other party in the taped conversation [with Moore]." Reply Br. in Support of Writ of Habeas Corpus By a State Prisoner 11.

dealings between Moore and the prosecutors. All of the prosecutors and the detective testified that they believed Moore was telling the truth at Petitioner's trial.

I do not know whether Moore's testimony was credible at his trial. The jury and the judge found it credible. The question for me is whether his testimony before me was credible, and it was not. Moore was a very angry witness. He said of the prosecutors at the States Attorney's office that "I despise them."[16] This statement is true, and, had he not said so explicitly, I would have drawn the inference that he hated them from other statements he made and from his demeanor when he spoke of the prosecutors. Petitioner, wisely, concedes that Moore is a habitual liar. "Indeed," writes Petitioner's counsel, "we believe that Moore is a pathological liar."

This concession appears to me to mean that Petitioner does not argue from the truth of Moore's testimony that he lied on the witness stand in Petitioner's trial. Since it is Petitioner's burden to prove that Moore lied (and the prosecutors knew it) in order to win his claim of knowing use of perjured testimony, the argument now should be that the facts which were knowingly withheld from defense counsel made the jury's determination of Griffin's guilt unreliable. And although *Brady* only mandates the disclosure of material evidence, the obligation to disclose evidence favorable to the defense may arise more broadly under a prosecutor's ethical or statutory obligations. *See Cone v. Bell*, 129 S.Ct. 1769, 1783 n.15 (2009) (citation omitted). An argument based on *Brady v. Maryland*, rather than a *Napue v. Illinois* argument, is appropriate

---

[16] Moore was deeply upset at the prosecution's failure to intervene on his behalf for a serious offense he committed sometime before testifying. Moore is serving a 60-year sentence for aggravated criminal sexual assault and his current release date, he testified, will leave him in prison for most, if not all, of the rest of his life. He believes, I find, that the failure of the prosecutors to rescue him from this (apparently) well-justified sentence for a crime against another person was an inexcusable wrong against him. I do not know whether this opinion is the reason for his recantation in state court but it clearly is a reason for his testimony in the hearing held here.

in this case.  There is no doubt that the *Brady* claim has been in this case from the start.  Yet the *Napue* claim is still pressed.

      A.  Moore's Substantive Perjury

      Moore testified that he was an enforcer for Ashley, was offered the job of killing Gibson, declined to do so, and recommended Petitioner, who he knew to be another enforcer.  Petitioner told Moore once before and twice after that he was involved in the killing.  Moore's testimony was corroborated by Petitioner's statement to a prosecutor and, by inference and a detail, from his statement to Moore in a recorded phone call.  What is not corroborated is Moore's claim that Ashley offered him the job and Moore recommended Petitioner.  Moreover, Moore's account and Petitioner's confession are not on all fours because Petitioner did not mention some of the details to which Moore testified.  The prosecutors, in reaching their conclusions about the truthfulness of Moore, could also rely upon the confession of Allen, the driver, of which they were aware, since it corroborated the crucial assertion that Petitioner murdered Gibson.  *See People v. Allen,* 540 N.E.2d 411, 414 (Ill. App. Ct. 1989).

      The argument Petitioner offers is weak.  Complete corroboration of Moore's testimony was not required by law or by practice.  Testimony which meshes perfectly is rare in any case and, when it does occur, raises more suspicions than the existence of differences.  That Petitioner did not, in his confession, mention everything that Moore testified to is not enough to prove that the prosecutors knew he was lying; it is not enough to raise significant doubts about truth.  What Petitioner seems to disregard is that corroboration that Petitioner murdered Gibson is relevant to the prosecutor's assessment of Moore's truthfulness.  The most important element of Moore's testimony is that he says that Petitioner was Gibson's murderer.  It is possible that Moore, knowing that this could be proved, just jumped on the bandwagon to help himself, but this does

not mean that the confession of Allen adds no weight to the prosecutor's conclusions. Moreover, when Moore agreed to call Petitioner, neither Petitioner nor Allen had confessed to anyone, and there may have been not much of a bandwagon to jump upon.

The prosecutors and Detective Pochordo all testified that they believed the testimony of Moore at trial was true. I find their testimony credible, but there remains the question of whether their actual belief was reasonable. The rule of "pure heart, empty head" has limits when applied to the duties of police and prosecutors to proceed in adherence to the Constitution.

The testimony of Franklin Freeman, offered by Petitioner, came to light after the trial of Petitioner had concluded. The prosecutors in the Ciralsky murder case (a half year or so later) wanted to use Freeman as a witness. To convince Freeman to testify, Detective Pochordo brought Moore to the Winnebago County Jail. Freeman denied any role in the killing of Ciralsky, so Pochordo allowed Moore, who had implicated Freeman, to speak alone with Freeman.

Freeman testified that Moore said he was conning Pochordo and the prosecutors, and he urged Freeman to play along. Moore suggested that if Freeman played along he could get other charges in Winnebago County dismissed. Moore told Freeman he was getting thousands of dollars and was free to sell drugs in Chicago as Pochordo got him out of a gun charge. Freeman admitted he went along by telling Pochordo and the grand jury that he did not kill Ciralsky, but that he did steal a billfold after the shooting.

Freeman swore to me that all of his testimony at the grand jury came from Moore, Pochordo, and a prosecutor (who did not participate in Petitioner's case). Pochordo told him what to say even though the detective knew he had failed a polygraph test. The prosecutor told Freeman to answer yes to every question in the grand jury. Freeman claims that all that testimony was a lie, which he told because his other charges had not yet been dismissed. Freeman thought

he was safe because he had robbed Ashley, and a jury would never believe he had been hired for the Ciralsky matter. The pending charges were dismissed. Three days later Freeman recanted.

It is difficult to credit anything that Freeman said if one hears it said face to face. The only thing I do credit is his desire to say something that would help the prosecution in the Ciralsky case in exchange for dismissals of other charges. He never had an intention to incriminate anyone in connection with Ciralsky's murder. He engaged in a low-risk fraud on the prosecution; low risk because, having robbed Ashley, a jury would find it difficult to believe either that Ashley would hire Freeman to kill someone or that Freeman would be willing to accept an assignment which might bring him into close contact with Ashley. I find no fault with the prosecutor putting Freeman before the grand jury. Even if the prosecutor thinks the witness is lying, it is best to pin the witness down under oath, which is an appropriate use of the grand jury. The prosecutors never used him as a witness in the Ciralsky murder case but rather charged him as a perpetrator.

Petitioner argues, persuasively, that neither Freeman nor Moore had any motive to help Petitioner. They certainly had no motive to help the respondent. But they had a motive to punish those who prosecuted them. The animus of Moore was quite patent in the courtroom. The animus of Freeman was less obvious, but quite clear in his demeanor. Both are serving long sentences, and the only gratification they have left is to inflict damage on those who put them away.

This brings us to Detective Pochordo. Petitioner argues that even if the prosecutors did not know that Moore was lying, Detective Pochordo did at the time of trial. If so, this is enough to justify issuing the writ. *Kyles v. Whitley,* 514 U.S. 419 (1995).

Moore recanted his testimony against Griffin in 1986. This was after the trial, but in the recantation he says he contacted Pochordo in August 1984. He asserted that Pochordo suspected

Ashley of causing several murders and Pochordo wanted a big arrest. Moore told Pochordo that he had little information about such a murder but had heard rumors on the street. Pochordo told Moore what to tell the prosecutors.

Pochordo denied instructing Moore to lie and testified that Moore never told him that Moore's testimony was untruthful. Petitioner argues that there is circumstantial evidence that Pochordo knew that Moore was lying because Pochordo's reports do not show any attempt to check (corroborate) Moore's tale. Pochordo did not cause Moore to be polygraphed. Pochordo knew Gibson had been seen getting into a black van. Moore told prosecutors about Griffin using a black van for six to eight months, but prosecutors concluded this story was fabricated or mistaken because the vehicle could not be found and Griffin had been in prison for part of the time covered by Moore's allegations. From this Petitioner infers that Pochordo supplied this detail to Moore. I do not understand Petitioner to be asserting that there is a possibility that Moore was simply mistaken, but simply that Moore's error is a circumstance that supports the idea that Pochordo planted the detail about the van into Moore's mind, knowing that he would use it. The final bit of circumstantial evidence is Pochordo's misrepresentation that Moore had provided him with accurate information in the past, which Pochordo is said to have done when applying for a search warrant.[17]

---

[17] The issue of Pochordo's truthfulness in securing a warrant arises in connection with another claim about the warrant and the application of *Franks v. Delaware.* Pochordo averred that Moore had provided him with accurate information which led to ten arrests. Six of those ten cases were resolved without Moore's help and three were resolved before Moore provided information. This cooperation occurred between 1980 and 1984. When he testified here in 2002, Pochordo could not remember all the names on the chart of cases where Moore gave information. He did remember that Moore had given information about the escape of James Allen which helped in his recapture. Pochordo also testified that Moore would help, not by giving information but by referring police to another individual who could tell them something useful. In the ten cases on the chart, there were convictions in six. The claim that reliable informants

That some police officers would manipulate a witness in this way or even testify falsely themselves is not a novel claim, nor would it be novel if it were true. Indeed, nineteen years ago a closely related claim came before me alleging that Detective Pochordo and another officer attempted to suborn perjury from Darryl Moore, Franklin Freeman, and James Allen in a case against Willie Stokes. In that case, I decided that qualified immunity did not protect an officer accused of suborning perjury. *Stokes v. City of Chicago,* 744 F. Supp. 183 (N.D. Ill. 1990). Less than six months after my ruling, the case was settled. Claims against Pochordo and the other officer were dismissed, and the City of Chicago paid plaintiffs $7,500.

Did Petitioner prove his claim here? The best that Petitioner can do is a tie. It is impossible for me to place any reliance on the testimony of Darryl Moore. The circumstantial evidence that Petitioner cites is not enough to overcome Moore's obvious and intense personal bias against the police and prosecutors with whom he dealt. There is no evidence that polygraphing witnesses was standard procedure (though it was done at times) so that one could draw the conclusion from Pochordo's failure to administer such a test that he was closing his eyes to the possibility of Moore lying or knew that Moore was lying. That Pochordo did not attempt to corroborate Moore's tale is not true. The telephone conversation between Moore and Petitioner was designed for that very purpose, as well as to gather evidence. Petitioner has not proved that Moore perjured himself or that Pochordo or the prosecutors knew it. And both statute (28 U.S.C. §2254(e)(1)-(2)) and case law (*Wilson v. Lash*, 457 F.2d 106 (7th Cir. 1972)) place the burden of

provided information has, I have no doubt, been abused by some officers. But that is not established here. There are justified suspicions but not proof of unreliability. Besides, the truthfulness of Pochordo's claim is supported by another circumstance in this case, i.e., Moore's animus toward those in authority who have not saved him from spending the rest of his life in prison for aggravated sexual assault. I infer from his attitude that he believes he gave valuable information over a long period of time and was not fairly rewarded.

proving deprivations of due process of law as well as any failure of state court adjudication upon the petitioner.

### B. The Payments to Moore

The key issue here is not whether Moore himself or Moore's expenses were paid. This is undisputed. Nor is the issue when the payments were made. The issue is whether there was a deal to pay Moore for his testimony. If there was, the fact that payments were made after testimony is not a saving grace but rather a prudent measure with a witness like Moore. Nor is it an issue that a good deal of the money paid was for services in a different trial handled by a different unit of the State's Attorney's office. The key issue is the purpose for which the money was spent. Was it to encourage Moore to testify against Griffin? If it was, disclosure should have been made. Witnesses who demand payment may very well be truthful, but a trier of fact should know the testimony is heard only because a fee was paid to the witness. Was the money paid to protect the witness from retaliation?[18] If it was, then the case for disclosure is weaker and, more importantly, the prejudice at trial to a defendant who is unaware of it is likely to be non-existent. Few, if any, defense counsel would want to tell the jury that the witness is being paid to relocate for fear of what defendant or his allies might do to prevent the testimony or to extract vengeance.

I credit the testimony of the prosecutors that the money was paid to relocate and to protect Moore from potential threats; to keep Moore away from his neighborhood and his home. That it failed to do so and that Moore essentially cheated the prosecution by, to a significant extent, misspending the money was unknown to the prosecutors. By some standards, one might conclude that the way money was spent on Moore was inconsistent with witness protection, but there were

---

[18] There is no dispute that the prosecutors could reasonably believe that a witness against Ashley, if not Petitioner, would have reason to fear being murdered.

no guidelines in the prosecutor's office when the payments here were made. "What a relocating witness was entitled to was determined on a case by case basis."[19] There was no intent to influence a witness by paying him money. *United States v. Agostino,* 132 F.3d 1183, 1195 (7th Cir. 1997).

Apart from the demeanor of the prosecutors who testified, there are circumstances that lend some small support to my conclusion about the truthfulness of their testimony that they were not paying Moore for his testimony. The first is that no one person was charged with the expenditures or keeping a record of them. Each individual prosecutor had no idea of what Moore was being paid, but several of them participated in authorizing payments. It is a minor point, but if there were an intent to pay off a witness, a careful effort to subvert justice would confine the effort to fewer actors. The second, and not so minor point, is that Moore's testimony was not so important and so helpful as to have been crucial.[20] Moore's testimony against Ashley may have been crucial – the record in that case is not before me and the case was not reviewed on appeal. Without Moore the evidence against Petitioner was his own court-reported confession and the tape/transcript of his conversation with Moore. This evidence was more than enough to convict Petitioner. Moore's testimony was helpful but not so important as to present a real temptation to prosecutors to buy his testimony against Petitioner. The third point is that Moore was not presented to the jury as an ordinary citizen. The jury heard he was a killer, drug dealer, robber, and thief who said, in exchange for testimony, he was going to have a firearms charge and a drug

---

[19] This language is taken from an affidavit submitted by United States District Judge William Hibbler, who was a knowledgeable supervisor in the State's Attorney's office at the time in question.

[20] The respondent argues that Moore's testimony was immaterial. This is not correct. Moore's account which implicated Ashley and Griffin in the murder of Carl Gibson is material.

case dismissed and a disposition of time served on an armed robbery charge reduced to robbery. He was an unattractive witness with a motive to lie for dismissals and a reduced sentence. Revealing that he was paid cash would not have diminished his credibility much more than these other factors.[21] So a prosecutor would have no particular motive to conceal the payments here. None of these circumstances preclude the possibility that prosecutors would break the law to add to the weight of their case against Petitioner. Law breakers, even lawyers, can act in ways that are inept in order to achieve small or meaningless gains, but this is unlikely considering the experience of the prosecutors in this case. The Petitioner's prosecutors were truthful before me.

Prior to the evidentiary hearing, the amended petition for the writ made five claims for the writ relying on appropriate constitutional foundations, to wit, knowing use of perjury at trial, ineffective assistance of counsel at sentencing, denial of the right to a hearing under *Franks v. Delaware,* ineffective assistance of counsel on appeal for failing to raise knowing use of false statements to secure warrants and orders and ineffective assistance of counsel at the fitness hearing. I read the petition and the memorandum in support of it as a demand for an evidentiary hearing on each of these issues.

The respondent argued that, while an evidentiary hearing was within my discretion in this case, it was unnecessary and ought not occur. Obviously I disagreed. The hearing I conducted provided a factual basis on which I could decide the claims.[22] And I have done so.

---

[21] Payment of money for testimony, even a small amount, could be useful to the defense in many circumstances. *Banks v. Dretke,* 540 U.S. 668 (2004). Payment for witness protection would not.

[22] The respondent argued that Petitioner had not properly raised the issue of a violation of the rule in *Franks v. Delaware* and that, while the challenge to the warrant and orders was not subject to pre-trial inquiry it was fully litigated at trial and Judge Strayhorn did deny the claim. While Petitioner did, in my view, forfeit the claim, the factual findings I have made do, in any

There is one issue left which deserves explication, that is, the claim that counsel was ineffective at the fitness hearing because he could have successfully attacked the conclusion of Dr. Bogan from the Behavior Clinic that petitioner was fit to stand for trial.

At the hearing George Howard testified that, on the eve of trial, he requested a fitness examination. He had not seen the institutional records of Petitioner's early commitment. Howard believed Petitioner was suffering a mental disorder related to his narcotics addiction and may have been or was, in fact, incompetent. The mental examination was had and Judge Strayhorn found Petitioner fit to stand trial after hearing the testimony of Dr. Bogan. That witness apparently had accepted Petitioner's word that he had attempted suicide 22 years earlier and had been committed to a mental institution.

Howard's concern, as is clear from his testimony, was not centered on Petitioner's ability to understand the proceedings but rather on the other element of fitness, the ability to assist in his defense. Defense counsel testified, "in the months pending trial and in my talking to Mr. Griffin in the jail, he had not been able and had not provided me with any vital information concerning his defense other than the fact that he didn't do it and that he didn't know anything about it." This conduct is equally consistent with fitness and its absence. An innocent Griffin may well know "nothing about it"; a guilty Griffin may rationally think there is nothing he can say to explain away his statements to Moore on the telephone on the grounds that silence is better than a clumsy lie and any man with a significant criminal history might rationally decide that it is best not to tell the truth to his lawyer.

_____

event, defeat the claim. So I find the *Franks* claim to be forfeited and, in the alternative, I find that the warrant and orders were not secured by perjury, false statements or reckless misrepresentations.

Howard delayed asking for an examination because he was waiting to see if Ashley would die and wanted to delay trial until that happened. When he was unsuccessful in doing so, he then asked for the examination.

The claim that defense counsel could have secured a finding of unfitness is inherently weak because it depends entirely on the conclusion of one expert (Hillman) that the opinion of Dr. Bogan could not be relied upon because Dr. Bogan failed to conduct a full social history before reaching the conclusion that Petitioner was competent. Had Dr. Bogan done so, Petitioner argues, he would have found a *bona fide* doubt of competency. Dr. Hillman, who offers the criticism of Dr. Bogan, candidly states that he could not, retrospectively, offer an opinion that Petitioner was not competent to stand trial at the time he did stand trial. A *bona fide* doubt requires a hearing but it does not require a finding that Petitioner was incompetent. The practice in this case is similar to the practice existing in federal court; an examination was ordered and the court decides, on the basis of that report and/or testimony by the examiner, whether there is enough doubt to require a hearing or simply determines, after hearing the testimony or reading the report of the examining doctor, that the defendant is fit to stand trial. I am unpersuaded by Dr. Hillman's opinion that the social history would have compelled a finding of unfitness to stand trial. Moreover, Dr. Hillman does not make a case that Petitioner was unfit to stand trial, so prejudice is not shown.

For the foregoing reasons, the petition for writ of habeas corpus is denied.

ENTER:

James B. Zagel
United States District Judge

DATE: July 29, 2009